BREAUX, C. J.
Plaintiffs sued for $25,-000 damages on account ‘of the death of their son, which occurred whilst at work for the defendant company.
He was a flagman, second in rank to the conductor or a caboose brakeman, on a freight train running from Vicksburg to Shreveport. He was instantly killed at about 6 o’clock, on the morning of July 12, 1903, at Sibley, the name of one of the stations of this road.
*236 The train, consisting of 28 ears, had stopped at this station, and upon its leaving the place the young man, aged about 25 years, met his death. While at Sibley 6 of the cars were cut off and left there. Of the remaining 22' ears, taking them in reverse order, there was, in the first place, the caboose, and immediately ahead there was an engine with■out steam, “dead,” carried as freight, and the remaining were bos cars, refrigerator •cars, and flat cars of the train on the locomotive in front. These cars are all numbered, and at their destination the height of sis of the number was taken. They were six ears in the rear, or near the rear, of the train.
The number of these cars which passed •over the deceased is Used by one of the witnesses at 10.
Just as the train left the station the de•ceased was seen standing on the ground .at the switch west of Sibley. The conductor was a short distance on his left. The latter ■started back toward the caboose. The deceased was not again seen by any of the crew ■of the train until the conductor saw the body, over which the cars had just passed.
The hotel keeper at Sibley was looking at the train as it was moving out on the morning in question. He saw the deceased walking on the roof of one of the cars, toward the caboose, facing the east on the train going west. He was, this witness thought, on about the second car of the train — i. e. second car from the locomotive — and had about 20 cars to walk over to get to the caboose. He was, at this time, about 100 yards from the telltale guard, to which we will specially refer in a moment. The train was under full headway and the deceased was walking at a moderate gait.
The postmaster at the station also saw him walking on top of the train facing the east, walking toward the caboose, and he was then only a few feet from the bridge —some 20 or 30 feet
The mangled body was, after the accident, found on the ground a short distance beyond and west of the bridge. This is an overhead bridge for pedestrians and carts and carriages, over a cut about 200 yards west of the station.
On the bridge, east of it, there is what is known as a telltale signal at a distance of 218 feet from the outer edge of the bridge.
The height of the bridge from the ball of the rail to the beam ofthebridge — in other words, the clearing space — gives rise to one of the issues; also the height of the telltale above the top of the cars. Plaintiff says that the bridge was too low and the telltale signal too high. This is in part controverted by defendant. Plaintiff’s measurement of the telltales is, from the ball of the rail to the lowest rope, 18 feet and 1 inch, and the bridge 17 feet and 10 inches, while defendants do not contest plaintiffs’ measurement. Of the telltale measurement, as made a short time after the accident, they assert, however, and this is borne out by the testimony, that some time prior to the measurement, but after the accident, some grading was done at and near the place and the track lowered, leaving the telltale higher from the rails before plaintiffs measured than it was at the date of the accident. The difference was three-quarters of an inch.
With reference to the duties of the rear brakeman, defendant’s contention is that the deceased was not where he should have been, that he was charged with the duty of protecting the rear of the train, and that he should have been in the cupola or lookout on the caboose.
It is proper, we should state, that the deceased was a bright, intelligent young man, who had been several years in defendant’s service and had full knowledge of all the duties incumbent upon him. It is said that he looked forward to promotion in railroad service.
*237 Upon these issues the case went to trial and resulted in a verdict for the plaintiff in the sum of $15,000.
It is reasonable to infer that the deceased lost his life by the blow he must have received immediately after the car on which he was walking came to the bridge. His death cannot be accounted for in any other way. The imprint found on one of the pieces of timber of the bridge leads to that inference. Besides the blood stains on some of the cars and his torn clothing strongly support that theory.
The steps just preceding the accident require special attention. He was standing west of the conductor, within easy speaking distance. He gave the order to start. Then it was that the conductor left, walked to the train, and found no difficulty in boarding the caboose.
The deceased, a younger man, active and nimble, walked to one of the first cars, boarded it, climbed to the roof, and stepped toward the caboose. Had the fall been traced directly to a misstep, it would be different. The mere act of boarding the train, as he did, and walking toward the rear ear, in the eye of a railroad employe, is not considered an imprudence. It was not conduct in itself considered very dangerous, particularly by those upon whom it devolves to direct the course of long, heavy freight trains.
He was not in his place of duty is charged by the employer. He should, according to defendant, have been in the caboose, or near it. We do not so understand; besides, it must be difficult for a young man, full of life on a bright morning, to remain in his caboose and on the top of the cars during the time that a train is stopped and part of the cars are taken out from the train. We have not found that he was at fault in stepping down to the ground.
The conductor, as we understand, in charge of the train and in command of h-is subordinates, did not seem to think at the time that he was violating any rule of the company. We think this rule applied to a running train, and not to a train at á station while ears are being cut off to be left there. The duty of a flagman on a running train is in the caboose. But where the train is not in motion, and it is broken to take cars from it, we do not understand that necessarily his place is in the narrow and peculiarly shaped cupola of the caboose.
We pass to the question of knowledge the young man may have had of the bridge in question. If there was danger, the young man should have been on his guard it is urged. This may be true as relates to the bridge. We are not inclined to the view that the question must be considered as if he had known all about the telltales or the height of the bridge.
The lawmaking power exact these bridge warnings. They should be so low as to absolutely touch the head or body of any train hand in ample time to notify him of his near approach to the bridge, and enable him to take the. necessary precautionary means to avoid the possibility of injury.
In other words, it is intended as notice that there is danger ahead, if any one standing on the top of the train does not lower his head and body.
This law is imperative in terms and should be complied with. Eor that reason it presents the serious issue of the case.
It does not occur to us that there was no necessity of a bridge warning. The mere fact that defendant placed a telltale as it did gives rise to the inference that generally the bridge could not be passed without danger of coming in contact with its lower beam; that stooping was, in most instances, absolutely necessary.
A warning having been erected, it should have been possible, without great difficulty, to prove that it was ample. It is known that cars are of different height. Oars of *238 different height, we believe, if anything, tend to increase the danger. They range in height from 12 to 13 feet. The height of the deceased was 5 feet and 8 inches.
A witness for defendant testified, as relates to measurement:
“A. 17 feet 9% inches to the telltale, and 17 feet 10 inches to the guard of the bridge.”
The measurement of six of the box cars of the train, those box ears nearest the caboose, in the rear, shows that they were over 12 feet in height, except one, which was just 12 feet, and a man standing on either of five of these ears could have been touched by the telltale cords; not, however, a man standing on the sixth car, measuring 12 feet in height. There were a number of other cars not measured. Why not measured is not stated in the testimony. The witness by whom the measurement was made said that the average height was 12 feet.
This is the testimony of defendant. That of plaintiffs shows a different result, and that a larger number of ears than shown by plaintiffs would pass under the strings of the telltale with a man standing in height 5 feet 8 inches.
Boarding the train before it was under full headway, at any car to which the flagman comes, seems to be a habit with the employes on freight trains. It would be safer, perhaps, to be more deliberate, and not to climb up on the side of the car to the roof. We are not directly dealing with that question. Walking on the roof is perhaps not the safest thing to do. It is generally done, and is sanctioned by the requirement of the service. To protect these employés to the extent possible, telltales have been devised. If they are insufficient to afford protection, a responsibility may arise, for which the defendant is liable, unless there was contributory negligence on the part of the workman injured or destroyed.
Naturally, from the viewpoint - of the plaintiff, it appears to the former that the deceased was near the front of the train when he was killed; on the other hand, plaintiff’s learned counsel argue that he was about the eighth or ninth car from the rear of the train. There is testimony sustaining each theory. If he was near the front, and it be true, as testified by one of defendant’s witnesses, that the average height of the cars is 12 feet, then it is reasonably probable that the deceased was not touched by the hanging ropes of the telltale.
If he was walking near the rear end, the chances were about equal to one that he was touched by the cords to five that he was not. We are not inclined to the view that he was near the caboose in the rear.
At the moment that the signal was given to move on, the deceased and the conductor, in easy talking distance of each other, were near the switch in front; at any rate, no great distance from the front. The conductor repaired to the rear. He did not afterward notice the deceased,, who stepped in the direction of the train, and in all probability boarded it, on coming up. This would not place him much of a distance from the front, as we do not understand that just then the cars were moving at a rapid rate of speed, and in all probability not many cars had passed him.
The accident, as it occurred, tends to give rise to the thought that he had not received warning.
It is not at all probable that, had he been touched by the cords, he would have omitted to stoop on arriving at the bridge. All agree that he was a bright, intelligent, good railroad man, thoroughly familiar with the details of his occupation. It is not to be, for an instant, presumed that he would have neglected to heed the warning.
Having considered the telltale, we pass to the bridge.
*239 The deceased habitually went through this bridge. Does it follow that he knew its height and the danger? We are not aware that he ever passed it on one of the cars, the top of which would have brought him in contact with the lower roof beams of this bridge.
His place was in the lookout while the train was running; his duty being to keep his eyes on the running train. It did not specially devolve upon him to notice the height of the bridges. He had the right to assume that they were above the danger line, in the absence of observation by himself or notice to the contrary. The notice was not given, so far as the record discloses, and we do not know that he had ever observed the height of the bridge.
A persisting thought arises: If the telltale warning had been lower, or the bridge higher, the deceased might not have lost his life.
We are constrained, we think, in our view of the evidence and the law, to affirm the judgment, except as relates to the amount, which, in view of amounts heretofore allowed, should be limited to $5,000.
It is therefore ordered, adjudged, and decreed that the judgment is amended by reducing the amount from $15,000 to $5,000, with legal interest on this amount, as heretofore fixed in the district court.
Plaintiff to pay costs of appeal.
PROYOSTY, J., dissents.